IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAMES ARGYLE MCALLEN, EL RUCIO LAND AND CATTLE COMPANY, INC., SAN JUANITO LAND PARTNERSHIP, LTD., and MCALLEN TRUST PARTNERSHIP,<br><br>Plaintiffs<br><br>v.<br><br>JON CHRISTIAN AMBERSON,<br><br>Defendant | § § § § § § § § § § § § § § § | Adv. Pro. No. |
| In re<br>JON CHRISTIAN AMBERSON,<br><br>Debtor | § § § § | Case No. 20-51324-cag<br><br>Chapter 11 |

**COMPLAINT OBJECTING TO DISCHARGE PURSUANT TO
SECTIONS 523(a)(2), 523(a)(4), and 523(a)(6) OF THE BANKRUPTCY CODE**

TO THE HONORABLE CRAIG A. GARGOTTA, UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs James Argyle McAllen, El Rucio Land and Cattle Company, Inc., San Juanito Land Partnership, Ltd. and McAllen Trust Partnership (collectively, the "McAllen Parties") bring this action against Defendant Jon Christian Amberson ("Debtor") for judgment and determination by the Court that the debt owed by Debtor to the McAllen Parties as represented by the Final Judgment[1] entered by this Court on September 23, 2020, is nondischargeable, and as cause therefore would show the Court as follows:

---

[1] A true and correct copy of the Final Judgment is attached hereto as **Exhibit A**.

L & B 24081/0003/L1853935.DOCX/    1

I. **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 & 1409.

3. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) & (I). To the extent that this is not a core matter, the McAllen Parties consent to entry of a final judgment by this Court pursuant to 28 U.S.C. § 157(c).

II. **PARTIES**

4. Plaintiff James Argyle McAllen ("McAllen") is an individual residing in Hidalgo County, Texas. He can be served through his undersigned counsel.

5. Plaintiff El Rucio Land and Cattle Company, Inc. is a Texas corporation with its principal place of business in Hidalgo County, Texas. It can be served through its undersigned counsel.

6. Plaintiff San Juanito Land Partnership, Ltd. is a Texas limited partnership with its principal place of business in Hidalgo County, Texas. It can be served through its undersigned counsel.

7. Plaintiff McAllen Trust Partnership is a Texas partnership with its principal place of business in Hidalgo County, Texas. It can be served through its undersigned counsel.

8. Defendant Jon Christian Amberson ("Amberson") is an individual residing in Bexar County, Texas. He may be personally served anywhere in the State he may be found.

III. **FACTUAL ALLEGATIONS**

9. McAllen is an eleventh-generation rancher in South Texas. The McAllen family (directly or indirectly) owns several ranches in the Rio Grande Valley. They also own various

entities for the purpose of holding, managing, and operating their ranching business, including those entities that comprise the remaining McAllen Parties.

10. From 1993 to 2014, Amberson was married to one of McAllen's daughters, Mary Margaret.

11. Amberson has also been an attorney licensed in Texas since 1986. At all times relevant to this suit, he was the owner of and practiced law under the auspices of his firm, Jon Christian Amberson Law, PC ("Amberson Firm"). Amberson advertises a law practice focused on Natural Resource and Environmental Law in South Texas.

### A. The Fee Dispute

12. In 2004, the McAllen Parties engaged Amberson and the Amberson Firm to represent them in a dispute with Forest Oil Corporation ("Forest Oil") relating to environmental contamination that Forest Oil caused on the McAllen ranches (the "Forest Oil Litigation"). At that time, Amberson was McAllen's son-in-law.

13. Amberson and the Amberson Firm collected millions of dollars in fees under an hourly fee arrangement over the course of the Forest Oil Litigation, including hourly fees that were awarded to the McAllen Parties as part of the arbitration award against Forest Oil. At the conclusion of the Forest Oil Litigation, however, Amberson and the Amberson Firm contended that they were entitled to millions of dollars in additional compensation under putative contingent fee engagements with the McAllen Parties.

### B. The Cannon Grove Transaction

14. In 2009, McAllen sought to defer significant capital gains taxes on real property by executing a "Reverse 1031 Exchange" as permitted under the Internal 26 U.S.C. § 1031. Under

the applicable laws and regulations, McAllen needed someone who was not a blood relative to act as an "intermediary" and hold the real property. Amberson qualified.

15. An entity, ultimately named Cannon Grove Investments, LLC ("Cannon Grove") was formed to hold the real property. McAllen, through Ranch Specialties Company, owned 10% of Cannon Grove. Amberson, through his entity Amberson Natural Resources, LLC ("ANR"), owned the other 90% of Cannon Grove. McAllen loaned $4,500,000 to Amberson/ANR, with which ANR purchased its interest in Cannon Grove.

16. ANR never repaid the money loaned to it by McAllen.

**C. State Court Litigation & Arbitration**

17. On or about January 23, 2015, the fee dispute, among other issues, was presented to the 92nd Judicial District Court in Hidalgo County, Texas ("Hidalgo District Court"). The Amberson Firm compelled the dispute to arbitration pursuant to its written engagement agreements. The Hidalgo District Court ordered the matter to arbitration before Arbitrator Tom Collins, the Amberson Parties' suggested arbitrator.

18. After a 10 ½-day arbitration hearing (the "Arbitration Proceeding"), including more than 300 exhibits and testimony from 17 witnesses, Mr. Collins entered an award (as later supplemented, "the Arbitration Award"),[2] in favor of the McAllen Parties and against the Amberson, the Amberson Firm, and Amberson (collectively, the "Amberson Parties").

19. At the Arbitration, the Parties grouped the McAllen Parties' claims by subject matter. The claims that are relevant to the instant objection to discharge were categorized as follows:

>   **Part II**:  False Litigation Expenses
>   **Part III**: First Community Bank Loan
>   **Part IV**: $545,000.00 Promissory Note

---

[2] A true and correct copy of the Arbitration Award is attached hereto as **Exhibit B**.

L & B 24081/0003/L1853935.DOCX/ 4

**Part VI**: Jefferson Bank Loan

**D. The Arbitration Award – Part II Claims (False Litigation Expenses)**

20. As to the McAllen Parties Claims under Part II, the Arbitrator found that Amberson caused the McAllen Parties to pay Amberson and/or the Amberson Firm $2,583,700.00 for fraudulent charges, detailed below.

21. Amberson caused the McAllen Parties to pay the Amberson Firm $250,000.00 for a "Cost Bond". Amberson knowingly made multiple untrue statements to the McAllen Parties to secure said payment from them. Amberson knowingly and falsely represented that (a) he had filed a Motion for Entry upon the Premises of the Forest Gas Plant, (b) the Court had cut the amount of the requested bond "in half", and (c) the Court ordered the "Cost Bond". The relevant Court Records do not reflect payment into the Registry of $250,000.00. At the Arbitration Hearing, Amberson conceded that he owed the $250,000.00 attributed to the putative "Cost Bond" to the McAllen Parties.

22. Amberson caused the McAllen Parties to pay the Amberson Firm $100,000.00, supposedly for a retainer owed to the American Arbitration Association ("AAA"). To induce the McAllen Parties to make said payment, Amberson knowingly, falsely represented to the McAllen Parties that Forest Oil and Conoco had chosen to arbitrate under the AAA Rules, and (b) AAA required the McAllen Parties to pay an initial retainer "to permit the procession of our choosing an arbitrator of our choice[.]" In fact, Forest Oil and Conoco had not demanded arbitration under AAA Rules, AAA was never involved in the Forest Oil Litigation, AAA never billed or requested $100,000.00 from Amberson, Amberson never paid AAA $100,000.00. At the Arbitration Proceeding, Amberson acknowledged that he owed the McAllen Parties the $100,000.00 charged as the putative AAA retainer.

23. Amberson caused the McAllen Parties to pay Amberson or the Amberson $300,000.00 for an "Arbitration Appeal Bond" that did not exist. On August 29, 2008, the Texas Supreme Court entered its final ruling in the Forest Oil Litigation. On September 4, 2008, Amberson sent McAllen an "Interim Billing" for a "Reimbursable Expense" denominated as an "Arbitration Appeal Bond", without further explanation. This payment was not a "Reimbursable Expense" because Amberson had not paid $300,000.00 to anyone. There was no such "Arbitration Appeal Bond", nor was there any basis for such a bond to be required or anticipated in the future. Amberson deposited the money into the Amberson Firm's operating account and spent it. At the Arbitration Proceeding, Amberson conceded that he owed the $300,000.00 to the McAllen Parties.

24. Amberson caused the McAllen Parties to pay the Amberson Firm $250,000.00 allegedly for a retainer ordered by the Court to compensate the neutral arbitrators in the Forest Oil Litigation. No such retainer had been ordered, and Amberson moved the funds from the Amberson Firm's IOLTA Account to the Operating Account and spent them, but never deposited those funds into the Court Registry, as supposedly ordered by the Court.

25. Over the course of the Forest Oil Litigation, Amberson caused the McAllen Parties to pay him or the Amberson Firm $1,685,000.00 for "expert retainers" that were, in the words of the Arbitrator, "made up expenses." Amberson and/or the Amberson Firm spent those funds; they were not held in trust for the McAllen Parties and were not returned to the McAllen Parties or applied to the McAllen Parties' bills. The list of fraudulent expert retainers is detailed at pages 25-26 of the Arbitration Award, as follows:

|   | Expert Name | Amount | Paid to Expert? |
|---|---|---|---|
| 1. | Ritter Environmental & Geotechnical Serv., Inc. | $50,000.00 | No |
| 2. | Ritter Environmental & Geotechnical Serv., Inc. | $50,000.00 | No |
| 3. | Andrew Scher | $10,000.00 | No |

|     |                                                                          |             |    |
|-----|--------------------------------------------------------------------------|-------------|----|
| 4.  | Raba Kistner Consulting, Inc.                                            | $75,000.00  | No |
| 5.  | Raba Kistner Consulting, Inc.                                            | $75,000.00  | No |
| 6.  | Raba Kistner Consulting, Inc.                                            | $50,000.00  | No |
| 7.  | Radiation Services, Inc.                                                 | $25,000.00  | No |
| 8.  | NewPark Environmental Services of Texas                                  | $50,000.00  | No |
| 9.  | Nuclear Sources and Services, Inc.                                       | $75,000.00  | No |
| 10. | Oak Ridge National Laboratory                                            | $75,000.00  | No |
| 11. | Sandia National Laboratories                                             | $25,000.00  | No |
| 12. | Dr. R.E. Rowland, Atomic Energy Commission, Office of Information Services | $50,000.00 | No |
| 13. | Stanley Waligora                                                         | $75,000.00  | No |
| 14. | Davis L. Ford & Associates                                               | $50,000.00  | No |
| 15. | Davis L. Ford & Associates                                               | $20,000.00  | No |
| 16. | Rohill Operating Company, Ltd.                                           | $35,000.00  | No |
| 17. | Rohill Operating Company, Ltd.                                           | $75,000.00  | No |
| 18. | Ronald Charbeneau, Ph.D., UT Austin                                      | $75,000.00  | No |
| 19. | Lee Wilson and Associates, Inc.                                          | $50,000.00  | No |
| 20. | Kevin S. Fischer, Trimeric Corp.                                         | $25,000.00  | No |
| 21. | PSC Services                                                             | $50,000.00  | No |
| 22. | Robert Peter Gale, M.D., Ph.D.                                           | $75,000.00  | No |
| 23. | Robert Peter Gale, M.D., Ph.D.                                           | $45,000.00  | No |
| 24. | Dr Roger O. McClellan                                                    | $50,000.00  | No |
| 25. | Cayias Consulting                                                        | $50,000.00  | No |

| 26. | JD Consulting, LP | $15,000.00 | No |
|---|---|---|---|
| 27. | Dr. Edward P. Cox, EPC Engineering Resources, Inc. | $15,000.00 | No |
| 28. | Israel Ramon, Jr., Law Offices of Israel Ramon, Jr. | $10,000.00 | No |
| 29. | Ceway Chemical Services | $5,000.00 | No |
| 30. | Saul Solomon | $25,000.00 | No |
| 31. | Jane Buckner, Buckner & Associates | $15,000.00 | $1,300.00 paid |
| 32. | Kevin Krist, Law Offices of Kevin Krist | $25,000.00 | No |
| 33. | William T. Lowery, Ph.D., Inc. | $40,000.00 | No |
| 34. | Hildreth Investigations, LLP | $225,000.00 | No |
| 35. | Alice Oliver-Parrot, PC | $25,000.00 | No |
| 36. | Ronald A. Britton | $50,000.00 | No |
|  | **Total** | **$1,685,500.00** | **$1,300.00** |

26. The Arbitrator found that the forty-two fraudulent transactions comprising the $2,583,700.00 also constituted breaches of Amberson's fiduciary duties owed to his clients, the McAllen Parties.

27. Amberson did not move to modify or vacate these findings and conclusions in the Arbitration Award.

28. Amberson (admittedly) owed the McAllen Parties duties of loyalty, good faith, and candor; he had an obligation to refrain from self-dealing and act with integrity of the strictest kind; he had a duty to engage in fair and honest dealing with them; he owed them full disclosure, honesty, and undivided loyalty. Amberson had a duty to inform the McAllen Parties about matters material to the representation and to inform them if he had a conflict of interest.

29. Amberson made knowingly false statements to the McAllen Parties when directing them to make payments for expenses or reimbursements that were not owed, in violation of his fiduciary duties regarding honesty, candor, and good faith, among others.

30. Amberson engaged in self-dealing by using these ill-gotten funds for his own purposes rather than for the benefit of the McAllen Parties, in violation of his duties regarding self-dealing, integrity, and fair and honest dealing, among others.

31. Amberson did not move to modify or vacate the findings and conclusions related to the breaches of fiduciary duty in the Arbitration Award.

32. The Arbitrator also found that the with regard to the aforementioned forty-two fraudulent transactions, Amberson made material misrepresentations to McAllen; Amberson knew the representations were false; Amberson intended McAllen to act in reliance on the false representations; McAllen justifiably relied on Amberson's misrepresentations; and the McAllen Parties suffered injury as a result of such justifiable reliance. Arbitration Award at 32.

33. Amberson did not move to modify or vacate these findings and conclusions in the Arbitration Award.

34. The Arbitrator also found that the forty-two transactions totaling $2,583,700.00 constituted violations of the Texas Theft Liability Act ("TTLA"). As to each of those transactions, Amberson unlawfully appropriated property (money) of McAllen, without McAllen's effective consent, with the intent to deprive McAlllen of such property. The Arbitrator awarded the McAllen Parties their direct damages of $2,583,700.00 plus $1,000.00 in statutory damages for each violation (*i.e.*, $42,000.00), as well as costs and attorneys' fees.

35. Amberson did not challenge the Arbitrator's findings and conclusions relating to liability under the TTLA.

36. The Arbitrator further found that Amberson had converted the $2,583,700.00 because he unlawfully and without authorization assumed and exercised control and dominion over McAllen's property (his money) to the exclusion of McAllen's rights.

37. Amberson did not challenge the Arbitrator's findings and conclusions related to liability under the theory of conversion.

38. For the Part II Claims, the Arbitrator Awarded the McAllen Parties

- $2,583,700.00 in actual damages
- $1,100,000.00 in prejudgment interest
- $42,000.00 in statutory damages under the TTLA

**E. The Arbitration Award – Part III Claims (First Community Bank Loans)**

39. Starting in 2005, Amberson, through the Amberson Firm, took out a line of credit with First Community Bank. By June 21, 2012, the total principal amount due under that line of credit was almost $2,000,000.00. Amberson represented to McAllen (including representations in writing) that the line of credit was to fund expenses in the Forest Oil Litigation. McAllen therefore provided collateral for the line of credit.

40. Amberson's representation that the line of credit was used to fund expenses in the Forest Oil Litigation was not true. Amberson knew the representation was false when he made it. Not a single penny from the line of credit was used to fund expenses for the Forest Oil Litigation, and at the Arbitration Hearing, Amberson made no effort to prove that *any* Forest Oil Litigation expenses were paid with the line of credit.

41. On June 21, 2012, McAllen borrowed $2,000,000.00 from Bank of America and used the proceeds of the loan to pay off in full the First Community Bank line of credit, for the benefit of Amberson and the Amberson Firm. McAllen also reimbursed Amberson and the Amberson Firm all of the interest that had been incurred on the line of credit, totaling $652,953.13.

In 2017, McAllen paid off the $2,000,000.00 loan from Bank of America, with interest, and without any contribution from Amberson or the Amberson Firm.

42. During the Arbitration Proceeding, Amberson acknowledged that he received the full benefit of the $2,652,953.13 paid by McAllen on account of the First Community Bank Line of Credit.

43. The Arbitrator found that Amberson's actions with regard to the First Community Bank line of credit violated Amberson's fiduciary duties including the obligations to refrain from self-dealing; to inform his client of a conflict of interest; to act with absolute candor, openness, and honesty; to disclose all material matters; and to act in utmost good faith, honest dealing, and integrity. The Arbitrator awarded McAllen damages in the amount of $2,652,953.13 arising from Amberson's breach of fiduciary duty.

44. Amberson did not challenge the Arbitrator's findings and conclusions related to the First Community Bank Line of Credit.

**F. The Arbitration Award – Part IV Claims ($545,000.00 Promissory Note)**

45. On December 28, 2007, Amberson executed a promissory note in the principal amount of $545,000.00 payable to McAllen. Based on the execution of the note, McAllen reduced the amount of the 2007 IRS Form 1099 report of income to the Amberson Firm from $1,762,010.74 to $1,217.010.74, a reduction of exactly $545,000.00. Amberson testified that this reduction substantially reduced his tax burden for 2007.

46. The promissory note matured in 2017. Amberson did not pay McAllen on the note.

47. The Arbitrator found that Amberson's actions with regard to the $545,000.00 promissory note constituted a breach of the fiduciary duties owed to McAllen. Specifically, the Arbitrator found that Amberson breached the duty to refrain from self-dealing and to inform the

client in writing of a conflict of interest; to act with absolute candor, openness, and honesty; to disclose all material matters' and to act in utmost good faith, honest dealing, and integrity.

48. The Arbitrator awarded McAllen $916,257.00, representing the principal and interest due on the note, as damages for Amberson's breach of fiduciary duty.

**G. The Arbitration Award – Part VI Claims (Jefferson Bank Note)**

49. During the Forest Oil Litigation, Amberson requested that McAllen provide collateral on a loan from Jefferson Bank, representing that the loan proceeds would be used to fund the Forest Oil Litigation.

50. McAllen and his wife, Frances, pledged certificates of deposit worth $1,750,000.00 to fully secure a loan to the Amberson Firm in the same principal amount. In 2011, the loan was increased to $2,250,000.00 and the McAllens pledge additional certificates of deposit so the loan was fully secured.

51. Not a single penny of the loan proceeds was used to fund the Forest Oil Litigation. Instead, the loan proceeds were used for expenses of the Amberson Firm or Amberson's personal expenses.

52. Neither Amberson nor the Amberson Firm repaid the loan to Jefferson Bank. Jefferson Bank foreclosed on the McAllen's certificates of deposit.

53. Amberson knew that the loan proceeds would not be used to fund the Forest Oil Litigation when he made that representation to McAllen.

54. Amberson made that false representation with the intent that McAllen and Frances would pledge their property as collateral for the Amberson Firm's Loan.

55. Amberson's conduct with regard to the Jefferson Bank Loan violated his fiduciary duties, including the duty to refrain from self-dealing and to refrain from using the attorney-client

relationship to benefit his own interests; the duty to inform the client of a conflict of interest; the duty to act with perfect candor, openness, and honesty; the duty of full disclosure; the duty of loyalty and utmost good faith; the duty of fair and honest dealing; and the duty to act with integrity of the strictest kind.

56. The Arbitrator awarded the McAllen Parties $1,750,301.21 in compensatory damages for the lost value of the certificates of deposit that Jefferson Bank foreclosed.

57. Amberson did not challenge the Arbitration Award as to the Jefferson Bank claims.

58. The Arbitrator awarded $2,000,000 in attorneys' fees to the McAllen Parties, of which $1,650,000,000 is attributable to the claims in Parts II, III, IV, and VI. He also awarded conditional attorneys' fees to the prevailing party on appeal.

59. Amberson has not challenged the Arbitrator's findings and conclusions related to the Jefferson Bank claims.

**H. Confirmation of the Award & Final Judgment**

60. As noted above, the McAllen Parties filed a pre-petition motion to confirm the Arbitration Award. The Amberson Parties moved to modify or vacate in part the Arbitration Award as it related to the $545,000.00 Promissory Note and the Cannon Grove Claims (which are not the subject of this objection to dischargeability). Ultimately, this Court confirmed the Arbitration Award, denied the motion to modify or vacate in part, and entered Final Judgment against the Amberson Parties and in favor of the McAllens. As set forth below, the monetary portions of the Final Judgment are excepted from discharge under sections 523(a)(2), (4), and (6) of the Bankruptcy Code.

### IV. COUNT I: THE FINAL JUDGMENT IS NON-DISCHARGEABLE PURSUANT 11 U.S.C. 523(a)(2)

61. The McAllen Parties incorporate by reference the foregoing paragraphs as though fully restated herein.

62. The Final Judgment awards the McAllen Parties damages for claims that are non-dischargeable under section 523(a)(2)(A) of the Bankruptcy Code. Pursuant to that section, obligations are excepted from discharge if the debt is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"

63. For purposes of that section, "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Husky Intern. Elecs., Inc. v. Ritz*, ___ U.S. ___. ___ 136 S. Ct. 1581, 1586 (2016).

64. In order to prevail on complaint under section 523(a)(2)(A), the creditor must show: "(1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result." *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018); *see also Selenberg v. Bates (Matter of Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017)

65. As to the McAllen's claims arising out of the False Litigation Expenses, Amberson falsely represented to the McAllen Parties that the funds were needed to pay non-existent costs purportedly incurred in the Forest Oil LItigation, including without limitation, to pay for non-existent bonds or to pay retainers for experts who had never been engaged.

66. As to the McAllen's claims arising out of the First Community Bank Loan and the Jefferson Bank Loan, Amberson falsely represented that the loan proceeds would be used to fund the Forest Oil Litigation.

67. At the time the false representations were made, Amberson knew they were false.

68. Amberson made the knowing, false representations with the intention and purpose to deceive McAllen. Amberson knew that McAllen would provide funds deemed necessary to prosecute the Forest Oil Litigation, and Amberson equally knew that McAllen would not simply transfer millions of dollars directly to Amberson for no business purpose.

69. McAllen relied on the false representations by Amberson.

70. The McAllen Parties were injured as a result of Amberson's false representations. They expended millions of dollars that were wholly unnecessary and were not used for their benefit.

71. Because the obligation to the McAllen Parties is for money obtained by fraud, the Final Judgment is nondischargeable pursuant to section 523(a)(2) of the Bankruptcy Code.

V. **COUNT II: THE DEBT IS NON-DISCHARGEABLE PURSUANT 11 U.S.C. § 523(a)(4)**

72. Plaintiffs incorporate by reference all the preceding paragraphs as though fully restated herein.

73. Section 523(a)(4), in pertinent part, excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). According to the Fifth Circuit, this exception applies to "debts incurred through abuses of fiduciary positions ... and involving debts arising from the debtor's acquisition or use of property that is not the debtor's." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citations and brackets omitted, ellipsis in original).

74. As the attorney for the McAllen Parties, Amberson indisputably (and admittedly) owed fiduciary duties to the McAllen Parties, under both federal and Texas law.

75. For purposes of section 523(a)(4), "[f]raud in a fiduciary capacity … requires positive fraud, or fraud in fact, involving moral turpitude or intentional wrong" and "typically requires a false statement or omission." *Light, et al. v. Whittington (In re Whittington)*, 530 B.R. 360, 388 (Bankr. W.D. Tex. 2014) (citations and internal quotation marks omitted).

76. Amberson made numerous false statements to the McAllen Parties. In each instance where Amberson requested that the McAllen Parties pay or reimburse False Litigation Expenses, Amberson made knowing false statements. Amberson told the McAllens that the loans from First Community Bank and Jefferson Bank would be used to fund the Forest Oil Litigation, and he knew those statements were false at the time he made them.

77. Thus, Amberson committed fraud while in a fiduciary capacity, and the debts arising therefrom are excepted from discharge.

78. Additionally, a debt may be excepted from discharge if it arises from "defalcation" while in a fiduciary capacity. For purposes of section 523(a)(4), "defalcation" by a fiduciary includes "self-dealing and wrongful diversion of ... funds …." *Whittington*, 530 B.R. at 388 (citation omitted).

79. Amberson engaged in impermissible self-dealing in every instance that he utilized the McAllen Parties' property for his own benefit or the benefit of the Amberson Firm without any benefit to the McAllen Parties. More specifically, but without limitation, Amberson engaged in self-dealing when he obtained control over or the benefit of the McAllen's property by making knowing, false representations that the property (or the proceeds therefrom) would be used to fund the Forest Oil Litigation, when he intentionally used those funds for his personal expenses or

expenses of the Amberson Firm. He further engaged in self-dealing by convincing McAllen to convert $545,000.00 of funds paid to the Amberson Firm to a promissory note so that Amberson could reduce his taxable income for 2007, which had no benefit to McAllen, and then failing and refusing to repay the note when it became due.

80. Amberson extensive pattern of self-dealing while he was the attorney for the McAllen Parties constitutes defalcation in a fiduciary capacity and all debts arising therefrom are non-dischargeable pursuant to section 523(a)(4) of the Bankruptcy Code.

## VI. COUNT III: THE DEBT IS NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(6)

81. The McAllen Parties incorporate by reference the foregoing paragraphs as though fully stated herein.

82. The obligation owed by Amberson to the McAllen Parties, as represented by the Arbitration Award and the Final Judgment, is the result of willful and malicious injury and is therefore excepted from discharge under section 523(a)(6) of the Bankruptcy Code, which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6).

83. For purposes of section 523(a)(6) an "injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. JD Abrams Inc. (Matter of Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).

84. The numerous transactions by which Amberson unlawfully obtained control over or benefitted from the McAllen's property were substantially certain to harm the McAllen Parties. In each instance, the McAllen's property was used to benefit Amberson, individually, or the Amberson Firm, with absolutely no benefit to the McAllen Parties. Thus, the McAllen Parties were deprived of the use, enjoyment, and benefit of their property without any justification.

85. Amberson also had a subjective intent to harm the McAllen Parties. Given the extent and duration of the transactions by which Amberson unlawfully deprived the McAllen Parties of their property, and the calculated manner in which he traded on his relationship as the McAllen's son-in-law and attorney, there can be no viable explanation for this scheme other than Amberson wanted to obtain or use the McAllen Parties' assets for his own benefit or the benefit of the Amberson Firm and he knew he could not do so by legal means. There is no believable justification for Amberson's conduct. He knew that the McAllens would not voluntarily transfer such huge sums of money to him without any corresponding benefit to them, so he resorted to stealing it from them.

86. The obligations owed by Amberson to the McAllen Parties are the result of "willful and malicious injury" and are therefore excepted from discharge under section 523(a)(6) of the Bankruptcy Code.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the McAllen Parties pray that the Court enter judgment in their favor and against Amberson, determining that the debts owed to the McAllen Parties under the Arbitration Award and the Final Judgment are excepted from discharge, and for such other and further relief to which they may be entitled at law or equity.

Dated October 23, 2020.

Respectfully submitted,

*/s/ Natalie F. Wilson*
Natalie F. Wilson, Tex. Bar No. 24076779
David S. Gragg, Tex. Bar No. 05253300
LANGLEY & BANACK, INC.
745 E. Mulberry Ave., Suite 700
San Antonio, Texas 78212
Telephone: (210) 736-6600
Facsimile: (210) 735-6889

        nwilson@langleybanack.com
        dgragg@langleybanack.com

-and-

David M. Prichard, Tex. Bar No. 16317900
David R. Montpas, Tex. Bar No. 00794324
PRICHARD YOUNG, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216
Telephone: (210) 477-7400
Facsimile: (210) 477-7450
dprichard@prichardyoungllp.com
dmontpas@prichardyoungllp.com

**ATTORNEYS FOR JAMES ARGYLE MCALLEN, EL RUCIO LAND AND CATTLE COMPANY, INC., SAN JUANITO LAND PARTNERSHIP, LTD., AND MCALLEN TRUST PARTNERSHIP**